**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Osterhaus Pharmacy Incorporated, *et al.*, | No. CV-24-01539-PHX-JJT |
| Plaintiffs, | **ORDER** |
| v. | |
| CVS Health Corporation, *et al.*, | |
| Defendants. | |

At issue are two related motions to compel arbitration (Doc 42; Doc. 68) filed by Defendants against the four named plaintiffs in this class action. The Court finds these matters appropriate for resolution without oral argument. *See* LRCiv 7.2(f). For the reasons set forth below, the Court denies in part Defendants' motions and orders supplemental briefing regarding the remainder thereof.

**I.    Background**

This case concerns alleged anticompetitive conduct in the sector of the pharmacy industry relating to the dispensation of drugs prescribed under Medicare health plans. The motions at issue here do not pertain to the merits of Plaintiffs' claims, but instead concern the threshold question of whether the claims are subject to mandatory arbitration. The Court therefore offers the following simplified version of the factual allegations underpinning this case.

Members of Medicare receive outpatient prescription drug benefits through Medicare Part D. (Doc. 65, First Amended Complaint (FAC) ¶ 42.) "Because Medicare

recipients are prescribed more drugs on average than the population as a whole, Medicare beneficiaries constitute an outsized percentage of prescriptions filled in the United States." (*Id.* ¶ 44.) Part D benefits are not directly administered by the federal Medicare program. (*Id.* ¶ 42.) Instead, Part D benefits are administered by a set of private sponsors largely comprised of national health insurance companies, such as Aetna, Cigna, and United. (*Id.*) These sponsors remit the actual administration of Part D benefits to "pharmacy benefit managers" (PBMs), which the sponsors either contract with or own. (*Id.* ¶¶ 43, 46.) "PBMs control every facet of the pharmaceutical filling and dispensing industry. They decide which pharmacies can dispense drugs in Part D Plan networks, which drugs those pharmacies will dispense, and the prices, discounts, and other terms of sale applicable to reimbursement of pharmacies." (*Id.* ¶ 48.)

According to the FAC, the PBM industry has become steadily more horizontally concentrated and vertically integrated over the past several decades. (*Id.* ¶¶ 49–59.) The field is now dominated by three PBMs, each of which is affiliated with a health insurer that is itself a dominant player in the insurance market. (*Id.*) Caremark is the largest PBM in the United States. (*Id.* ¶ 10.) It is affiliated with Aetna, which is one of the largest health insurers in the country. (*Id.*) The other two major PBMs are OptumRx and Express Scripts, which are affiliated with United and Cigna, respectively. (*Id.* ¶ 53.) The claims at issue here are against Caremark, Aetna, and their corporate affiliates. Caremark and Aetna are both owned by CVS Health Corporation, which also owns the largest chain of pharmacies in the nation. (*Id.* ¶ 10.) The level of concentration and integration present in the PBM industry creates enormous opportunity for anticompetitive conduct. (*Id.* ¶¶ 54–59.) Because Caremark controls access to such a large portion of the country's Part D beneficiaries, independent pharmacies have no choice but to accept Caremark's terms of doing business, however unfair or onerous they may be. (*Id.*)

The FAC alleges that Caremark has engaged in monopolistic behavior by way of an anticompetitive fee structure known as "direct and indirect remuneration" (DIR). (*Id.* ¶¶ 60–70.) Under the applicable Medicare rules and regulations, the drug price presented

to the patient at the point of sale must reflect all negotiated price concessions. (*Id.* ¶¶ 60–63.) However, in 2016, the federal Centers for Medicare and Medicaid Services (CMS) exempted a narrow class of price concessions from the general rule that all such concessions must be determined at the point of sale. (*Id.* ¶ 65.) The exempted fees are "those contingent price concessions that cannot reasonably be determined at the point-of-sale." (*Id.* ¶ 65 (quoting 42 C.F.R. § 423.100 (2016)).) The FAC alleges that Caremark has abused this provision by illegitimately extracting millions of dollars from independent pharmacies. (*Id.* ¶¶ 66–70.) For example, the FAC claims that "[r]ealizing an opportunity to pilfer money from [independent pharmacies] purportedly under the 2016 CMS changes, CVS Caremark fabricated fees that 'could not be calculated at the point of sale.'" (*Id.* ¶ 74.) According to the FAC, Caremark imposes DIR fees in an anticompetitive manner by which Caremark benefits from either (1) extracting substantial fees from independent pharmacies or (2) forcing independent pharmacies out of business, thereby driving customers to CVS Caremark's own chain of pharmacies. (*Id.* ¶¶ 70, 93–107, 111.)

In order to join Caremark's network, which the FAC alleges independent pharmacies have no choice but to do, pharmacies must sign a short adhesion contract known as a "provider agreement." (*Id.* ¶¶ 108–18.) This provider agreement is subject to unilateral amendment by Caremark on a near limitless basis. (*Id.*) The provider agreement incorporates numerous documents by reference, most significantly the "provider manual," which Caremark regularly amends on a unilateral basis. (*Id.*) The one-sided nature of Caremark's contractual relations with independent pharmacies effectively grants Caremark sole discretion to shape the parties' relationship to its liking, including by imposing anticompetitive DIR fees that independent pharmacies lack the leverage to object to. (*Id.*) According to the FAC, Caremark's contractual terms violate numerous state and federal laws governing the provision of pharmacy services. (*Id.* ¶¶ 119–24.) "CVS Caremark seeks to shield its unlawful conduct from being challenged by including in its contracts with Independent Pharmacies a forced arbitration clause with several unconscionable terms." (*Id.* ¶ 125.) It is this arbitration provision that forms the crux of the instant motions.

Plaintiffs are four independent pharmacies, with "independent" defined as "not part of the same corporate family as any of the three largest" PBMs. (*Id.* ¶¶ 9, 52.) Defendants are eleven entities, all of which exist within the CVS/Caremark/Aetna corporate umbrella. Plaintiffs have brought suit on behalf of themselves and on behalf of "[a]ll Pharmacy Services Providers in the United States that are not members of the same corporate family as a Big Three PBM and that have paid DIR fees directly to CVS Caremark from September 26, 2019 until the time of trial." (*Id.* ¶ 127.) The FAC asserts the following seven federal and state claims: (1) violation of the Sherman Antitrust Act, (2) breach of contract, (3) breach of the implied covenant of good faith and fair dealing, (4) declaratory judgment of unconscionability, (5) declaratory judgement of illegality based on violation of Medicare regulations, (6) unjust enrichment, and (7) quantum meruit. (*Id.* ¶ 138–71.)

Plaintiff Osterhaus Pharmacy initiated this action in September 2023 in the Western District of Washington. (Doc. 1.) On June 18, 2024, the federal court in Washington transferred this case *sua sponte* to the District of Arizona. (Doc. 53.) Prior to the transfer of venue, Defendants filed a Motion to Compel Arbitration (Doc. 42), to which Osterhaus Pharmacy filed a Response (Doc. 44) and Defendants filed a Reply (Doc. 48). Following the transfer of venue, three additional plaintiffs joined this action. Shortly thereafter, Defendants filed a Motion to Compel Arbitration Against Newly Named Plaintiffs (Doc. 68), to which Plaintiffs filed a Response (Doc. 70) and Defendants filed a Reply (Doc. 72). Although the two motions differ slightly, their substantive arguments are largely identical, as are the grounds upon which Plaintiffs object to them. The Court will therefore consider the two motions in tandem.

## II. Legal Standard

Because the arbitration agreements at issue here concern interstate commerce, they are governed by the Federal Arbitration Act (FAA). *See* 9 U.S.C. § 2. Courts have recognized the FAA as a "liberal federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983). When presented with a dispute implicating the FAA, a court must compel arbitration if the court determines that a

valid agreement to arbitrate exists and that the agreement encompasses the dispute at issue. *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). District courts apply state law principles governing the formation of contracts to determine whether a valid arbitration agreement exists. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Under the FAA, "agreements to arbitrate [may] be invalidated by generally applicable contract defenses, such as fraud, duress, or unconscionability, but not by defenses that apply only to arbitration or that derive their meaning from the fact that an agreement to arbitrate is at issue." *Lim v. TForce Logistics, LLC*, 8 F.4th 992, 999 (9th Cir. 2021) (citation and internal quotations marks omitted).

In *First Options*, the Supreme Court explained that there are often three separate but interrelated disagreements in cases involving a disputed arbitration agreement.

> First, [parties] disagree about . . . the *merits* of the dispute. Second, they disagree about whether they agreed to arbitrate the merits. That disagreement is about the *arbitrability* of the dispute. Third, they disagree about *who should have the primary power to decide the second matter.* Does that power belong primarily to the arbitrators (because the court reviews their arbitrability decision deferentially) or to the court (because the court makes up its mind about arbitrability independently)?

514 U.S. at 942. Although courts resolve the first two questions according to "ordinary" contract law, courts employ a more rigorous version of contract law to the third question, thereby reversing the general federal presumption favoring arbitration. *Id.* at 944–45. Thus, a court may find that parties have delegated to an arbitrator the threshold issue of arbitrability only where there is "clear and unmistakable" evidence of such a delegation. *Id.* (cleaned up) (quoting *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 649 (1986)). A contractual provision delegating the issue of arbitrability to an arbitrator is commonly known as a delegation clause or a delegation provision. *See, e.g.*, *Lim*, 8 F.4th at 1000. Even where a delegation clause clearly and unmistakably assigns the adjudication of arbitrability to an arbitrator, a party can nevertheless argue that the delegation clause itself is unenforceable under the relevant law of contracts. *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63, 71 (2010). Although the basis of alleged invalidity may affect the contract as a whole to the same extent that it affects the delegation clause in particular, the Supreme

Court requires that any challenge to a delegation clause be specifically denominated as such. *Id.*

The standard governing summary judgment controls the resolution of a motion to compel arbitration. *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021). "The summary judgment standard is appropriate because the district court's order compelling arbitration is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate." *Id.* (citation and internal quotations marks omitted).

### III.  Discussion

The instant motions present a dispute as to the second and third questions identified in *First Options* above: respectively, *whether* the parties' antitrust dispute is arbitrable and *who* is to decide the issue of arbitrability. Plaintiffs expressly recognize, as they must, that an adjudication of the second question is contingent upon the answer to the third question being "the Court." (*See* Doc. 44 at 16–17.) Thus, the Court must first determine who is to be the arbiter of arbitrability. If the answer to that question is the Court, then the question becomes whether the parties' underlying antitrust dispute is subject to arbitration.

### A.  Did the Parties Delegate the Issue of Arbitrability to an Arbitrator?

The parties agree upon much of the legal background that informs the analysis of delegation. There is no dispute that Plaintiffs entered into contracts with Caremark containing arbitration agreements that encompass Plaintiffs' claims, and there is no dispute that these contracts were supported by consideration. There is also no dispute that the arbitration agreements contain delegation clauses entrusting the determination of arbitrability to an arbitrator. Furthermore, the parties agree that the terms of their contracts are subject to Arizona law. (Doc. 44 at 9.) Although each plaintiff entered into a separate provider agreement with Caremark, all such contracts incorporated the terms of the Caremark provider manual. Caremark updates this manual every two years, but the material terms of the manual's delegation clause have not changed since Plaintiffs' earliest claim allegedly arose in 2016. In the 2016 provider manual, the delegation clause provided

that "[t]he arbitrator(s) shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of the agreement to arbitrate, including but not limited to, any claim that all or part of the agreement to arbitrate is void or voidable for any reason." (Doc. 43-4 at 44.) The 2024 provider manual contains a delegation clause that is identical but for the addition of an oxford comma and the transposition of an interior comma, (Doc. 69-3 at 95), and the provider manuals from 2018, 2020, and 2022 also contained substantively indistinguishable delegation clauses, (Doc. 43-5 at 51; Doc. 43-6 at 91; Doc. 69-1 at 97). For ease of reference, and in light of the substantive similarity of the delegation clauses in the respective contracts between Plaintiffs and Caremark, the Court will refer to the foregoing agreements as a single contract.

Plaintiffs do not contest the clarity or the unmistakability of the delegation clause. Instead, they argue that the delegation clause, clear and unmistakable as it may be, is unconscionable under Arizona contract law and therefore unenforceable. If Plaintiffs are correct, then the delegation clause is void, and the gap is filled by the "presumption" that questions of arbitrability are left to the courts. *See First Options*, 514 U.S. at 944–45. In an effort to foreclose any substantive analysis, Defendants present two gate-keeping arguments as to why the Court should not even bother examining Arizona's unconscionability jurisprudence. Neither persuades.

Defendants first cite *Rent-A-Ctr., W., Inc. v. Jackson*, 561 U.S. 63 (2010), for the proposition that "[t]he United States Supreme Court has expressly concluded that, by agreeing to arbitrate questions of 'enforceability,' contracting parties clearly and unmistakably agree to arbitrate unconscionability." (Doc. 42 at 19; Doc. 68 at 15.) The Supreme Court held no such thing. In fact, the Court held the exact opposite. After noting that delegation clauses are not "unassailable," the Court held that "[i]f a party challenges the validity under § 2 [of the FAA] of the precise agreement to arbitrate at issue, the federal court must consider the challenge before ordering compliance with that agreement under § 4." *Rent-A-Ctr.* 561 U.S. at 71. The Court noted that "[a]n agreement to arbitrate a

gateway issue is simply an additional, antecedent agreement the party seeking arbitration asks the federal court to enforce, and the FAA operates on this additional arbitration agreement just as it does on any other." *Id.* at 70. Because a delegation clause is merely a severable agreement to arbitrate the threshold issue of arbitrability, a delegation clause is rendered void by the same contract infirmities that might void other aspects of an arbitration agreement, including the defect of unconscionability. *See id.* at 74. The Supreme Court expressly noted that the defense of unconscionability can invalidate a delegation clause, but the Court did not ultimately examine whether the delegation clause in *Rent-A-Center* was unconscionable because the plaintiff had not specifically directed his challenge to the delegation clause. *Id. Rent-A-Center* therefore stands for the procedural proposition that a court must "require the basis of challenge to be directed specifically to the agreement to arbitrate before the court will intervene." *Id.* at 71. But where a party adequately challenges the enforceability of a delegation clause on grounds of unconscionability, the Supreme Court clearly held that a district court must "consider the challenge before ordering" arbitration. *See id.* at 71. Defendants' argument is therefore unavailing.

Defendants' second gate-keeping argument is that Plaintiffs have not "challenged the delegation clause specifically." (Doc. 48 at 2–3; Doc. 72 at 1–2.) This contention is incredible. Plaintiffs specifically attack the validity of the delegation clause on nearly every page of their briefing. (*See generally* Doc. 44; Doc. 70.) By way of example, Plaintiffs' two responsive briefs contain tables of contents that include, *inter alia*, the following sections: "Caremark's Delegation Clause is substantively unconscionable"; "The Delegation Clause is procedurally unconscionable because it was presented in a way that deprived Osterhaus of meaningful choice"; "Arbitration clauses, including delegation clauses, are substantively unconscionable and unenforceable when they make it unaffordable for persons to effectively vindicate their substantive statutory rights"; "Arbitrating arbitrability under Caremark's delegation clause and its entire arbitration clause is prohibitively costly and thus unconscionable and in violation of the federal effective vindication of rights doctrine." Defendants' fallback argument is that Plaintiffs'

challenge to the delegation clause is insufficient because Plaintiffs aim the same challenge at the arbitration agreement as a whole. To be sure, Plaintiffs assert that the arbitration agreement writ large is unconscionable for the same reasons that the delegation clause in particular is. But the Ninth Circuit has expressly approved of a dual argument of this nature.

> To provide some guidance, we distill *Rent-A-Center* into two principles. First, a party resisting arbitration must mention that it is challenging the delegation provision and make specific arguments attacking the provision in its opposition to a motion to compel arbitration. Second, a party may challenge the delegation provision and the arbitration agreement for the same reasons, so long as the party specifies why each reason renders the specific provision unenforceable. There are many reasons why a party may be required to use nearly identical challenges to the delegation provision and the arbitration agreement as a whole. Notably, nothing in *Rent-A-Center* requires fashioning completely distinct arguments. In fact, it suggests that if the plaintiff had argued the procedures rendered both the delegation provision and the arbitration agreement unconscionable, the court should have considered the challenge.

*Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009–10 (9th Cir. 2023). Plaintiffs have presented the precise kind of unconscionability challenge that the Ninth Circuit countenanced in *Bielski*. Therefore, the Court must proceed to the substance of Plaintiffs' contentions regarding unconscionability. Plaintiffs argue that the delegation clause is both substantively and procedurally unconscionable. In Arizona, substantive unconscionability and procedural unconscionability are separate defenses to enforcement of an arbitration provision, and either one standing alone is sufficient to render the agreement void. *Rizzio v. Surpass Senior Living LLC*, 251 Ariz. 413, 417 ¶ 9 (2021).

### 1. Substantive Unconscionability of the Delegation Clause

Plaintiffs present three meritorious arguments addressing substantive unconscionability, the first of which is that the delegation clause is substantively unconscionable when read in conjunction with the arbitration agreement's escrow and breach provisions because those provisions collectively impose an unduly oppressive financial burden on Plaintiffs that effectively precludes them from vindicating their rights

in any forum. (Doc. 44 at 10–12; Doc. 70 at 5–7.)[1] "A party is [] permitted under *Rent-A-Center* to challenge the enforceability of a delegation clause by explaining how 'unrelated' provisions make the delegation unconscionable." *Holley-Gallegly v. TA Operating, LLC*, 74 F.4th 997, 1002 (9th Cir. 2023). "Substantive unconscionability concerns the actual terms of the contract and whether they are 'overly oppressive or unduly harsh to one of the parties.'" *Rizzio*, 251 Ariz. at 417 ¶ 10 (quoting *Clark v. Renaissance W., LLC*, 232 Ariz. 510, 512 ¶ 8, (Ct. App. 2013)). "Accordingly, an arbitration agreement may be unenforceable when a party cannot effectively vindicate her rights in the arbitral forum due to the prohibitive costs of arbitration." *Id.* In *Rizzio*, the Arizona Supreme Court adopted a tripartite framework for adjudicating a claim that the monetary burden of an arbitration provision renders the agreement unconscionable.

> Under that framework, a party seeking to invalidate an arbitration agreement must establish arbitration costs with reasonable certainty; costs cannot be speculative. Next, the party must make a specific, individualized showing that she would be financially unable to bear the costs of arbitration. Lastly, the court considers whether the agreement permits a party to waive or reduce arbitration costs because of financial hardship. Ultimately, the determination of substantive unconscionability is a question of fact that depends on the unique circumstances of each case. Absent a showing that arbitration costs would deny the plaintiff meaningful access to a forum in which she could vindicate her rights, a court will not find an arbitration agreement substantively unconscionable.

---

[1] Plaintiffs also present numerous additional arguments regarding substantive unconscionability, none of which have merit. Plaintiffs contend that the one-sidedness of the escrow provision is unconscionable, (Doc. 44 at 12), but the escrow provision is not one-sided, (Doc. 43-6 at 92; Doc. 69-3 at 97). Plaintiffs contend that Caremark's unilateral power of amendment renders the delegation clause unconscionable, but Plaintiffs concede that a unilateral ability to amend only creates unconscionability if the *exercise* of the amendatory power is unconscionable. (Doc. 70 at 8–9.) The sole unilateral amendment that Plaintiffs point to is the anti-aggregation provision that prohibits joint actions brought by multiple storefronts of a single pharmacy business. This provision barely affects Plaintiffs, three of which own only a single location and the fourth of which owns only two locations. (*See* Doc. 70 at 5.) To the extent the anti-aggregation provision affects the fourth Plaintiff, the Court considers the effect within the primary analysis of whether the cost of arbitrating arbitrability is unduly harsh. Plaintiffs contend that the delegation clause is unconscionable because the arbitration agreement designates Arizona as the arbitral forum. (Doc. 70 at 10–11.) Plaintiffs do not explain why *arbitrating* in Arizona would be any more oppressive than *litigating* in Arizona. Moreover, the four named plaintiffs are from four different states, and Plaintiffs do not (and likely cannot) identify any forum that would be more convenient than Arizona.

1  *Id.* ¶ 11 (internal quotation marks and citations omitted).

2  The first element of the *Rizzio* unconscionability test requires that Plaintiffs "establish arbitration costs with reasonable certainty; costs cannot be speculative." 251 Ariz. at 417 ¶ 11. The Caremark provider manual mandates that a party seeking to arbitrate a claim must deposit into an escrow account an amount of money determined by the arbitrator to cover the opposing party's costs, fees, expenses, and potential award, but such amount shall in all instances be at least $50,000 per pharmacy location. (*See* Doc. 43-6 at 92; Doc. 69-3 at 97.) Thus, in order to arbitrate the threshold question of arbitrability, the three plaintiffs that own one pharmacy location would need to front at least $50,000 each, and the one plaintiff that owns two locations would need to front at least $100,000. Plaintiffs have satisfied the first *Rizzio* requirement.

The second element of the *Rizzio* test requires that Plaintiffs "make a specific, individualized showing that [they] would be financially unable to bear the costs of arbitration." 251 Ariz. at 417 ¶ 11. Each plaintiff has submitted a sworn affidavit stating that it cannot afford the up-front escrow minimum and will not be able to pursue its claims if required to pay the escrow minimum. (Doc. 71-1, Exs. 2–5.) Plaintiffs support these assertions with a few tidbits of information regarding their pharmacies' profitability or lack thereof, but this evidence is sparse and does not paint a holistic picture of Plaintiffs' respective financial situations. This level of evidentiary support is insufficient to establish an inability to bear the costs of arbitration under *Rizzio*, *see* 251 Ariz. at 420 ¶ 23, but the Court concludes for several reasons that Plaintiffs' evidentiary infirmity is not fatal to their argument. First, Defendants do not raise any objection in their reply briefing to Plaintiffs' evidence. Although Defendants note in a parenthetical that individualized evidence beyond speculative affidavits is necessary to establish that the costs of arbitration are prohibited, (*see* Doc. 72 at 5), Defendants do not develop this argument and do not explain whether this parenthetical is directed to the costs of arbitration or Plaintiffs' ability to afford those costs. Indeed, Defendants do not cite even one time to Plaintiffs' evidentiary documents or include even one challenge directed specifically thereto. Defendants offer several legal

arguments in favor of their motions to compel, which the Court discusses below, but Defendants neglect to make any factual arguments. They have therefore waived any argument predicated on the lack of particularity of Plaintiffs' evidence. *See Brown v. Sperber-Porter*, No. CV-16-02801-PHX-SRB, 2017 WL 10410091, at *4 (D. Ariz. Dec. 20, 2017) (noting that "a court may consider an argument conceded when a party fails to counter it"). Second, in *Rizzio* the Arizona Supreme Court compelled arbitration because the plaintiff had failed to establish with reasonable certainty both the costs of arbitration *and* her inability to afford those costs. *See* 251 Ariz. at 420 ¶ 22. Here, in contrast, Plaintiffs have clearly demonstrated the costs of arbitration. This distinguishing factor renders *Rizzio*'s decision to compel arbitration inapposite to the instant case. Third, although this Court must apply state contract law as set forth by the Arizona Supreme Court, this Court is not bound to defer to the state court on issues concerning the federal policy favoring arbitration agreements under the FAA. The *Rizzio* court's ultimate disposition of the motion to compel is therefore not mandatory, as it rested on the court's interpretation of federal arbitration policy. *See id.* ¶ 24. Moreover, the *Rizzio* court invoked a general policy favoring arbitration, but there is no such general policy favoring arbitration of threshold issues of arbitrability, at least where the validity of the relevant delegation clause is suspect. *See First Options*, 514 U.S. at 944–45. Thus, the Court concludes that Plaintiffs' insubstantial evidence of their respective financial situations is not fatal to their claim of unconscionability. Plaintiffs have satisfied the second element of the *Rizzio* test.

The final element of the Rizzio test concerns "whether the agreement permits a party to waive or reduce arbitration costs because of financial hardship." *Id.* at 417 ¶ 11. Here, the arbitration agreement contains no provision for a cost reduction in the event of financial hardship. The arbitration agreement states that the failure to deposit at least $50,000 per pharmacy location into escrow constitutes a material contractual breach, and there are no exceptions to this clause. (Doc. 43-6 at 92; Doc. 69-3 at 97.) Defendants claim that Plaintiffs do not actually need to deposit anything into escrow before arbitrating the issue of arbitrability. (Doc. 48 at 6–7; Doc. 72 at 5.) Defendants support this argument with a

citation to an arbitral decision that adjudicated the unconscionability of an escrow provision prior to the plaintiff's compliance therewith. This citation is unavailing because (1) Defendants themselves contend that that decision was erroneous and that it "is nonprecedential and should not be given any weight" and (2) the plain language of the escrow provision requires the deposit of a least $50,000 at the initiation of any arbitration brought under the arbitration agreement, which encompasses "any claim that all or part of the agreement to arbitrate is void or voidable for any reason." (Doc. 43-6 at 91–92; Doc. 69-3 at 95, 97.) In other words, according to the explicit terms of the contract, Plaintiffs must each place into escrow a large sum of money to arbitrate even the threshold issue of arbitrability. The Court will not disregard clear contractual text in favor of a nonprecedential arbitral decision in an unrelated case that Defendants expressly maintain was erroneous. Therefore, Plaintiffs have satisfied the third element of the *Rizzio* test for substantive unconscionability.

As noted above, Defendants do not contest the onerousness of the escrow provision on factual grounds. Instead, Defendants assert two high-level legal arguments. The first is that the Ninth Circuit has purportedly already upheld the exact escrow provision at issue here. Defendants cite *Caremark, LLC v. Chickasaw Nation*, 43 F.4th 1021, 1034 n.13 (9th Cir. 2022), which states that the escrow provision "does not impose a barrier sufficient to render the delegation clause unenforceable." The plaintiffs in that case were "[t]he Chickasaw Nation and five pharmacies that it owns and operates." Here, Plaintiffs are not one of the largest Native American tribes in the country; they are four small, independent pharmacies. As the Arizona Supreme Court recognized, "the determination of substantive unconscionability is a question of fact that depends on the unique circumstances of each case." *Rizzio*, 251 Ariz. at 417 ¶ 11. The fact that the escrow provision was not unconscionable as applied to the Chickasaw Nation has no bearing whatsoever on the present case. Defendants' second argument is that a contract between two businesses cannot be unconscionable. But as Defendants expressly concede, unconscionability in the commercial context is merely "rare," not impossible. (Doc. 48 at 5; Doc. 72 at 4.)

1  "Although a commercial purchaser is not doomed to failure in pressing an
2  unconscionability claim, findings of unconscionability in a commercial setting are rare."
3  *Salt River Project Agr. Imp. & Power Dist. v. Westinghouse Elec. Corp.*, 143 Ariz. 368,
4  374 (1984), *abrogated in part on other grounds by Phelps v. Firebird Raceway, Inc.*, 210
5  Ariz. 403 (2005) (internal citation omitted). Defendants fail to develop this general
6  proposition into an argument that applies with any specificity to the instant case. Therefore,
7  the Court concludes that the arbitration agreement's escrow provision renders the
8  delegation clause unconscionable under *Rizzio* and thus unenforceable.

9  Plaintiffs identify two additional sources of substantive unconscionability. First,
10 Plaintiff's contend that the delegation clause is unenforceable when read in conjunction
11 with the arbitration agreement's fee shifting provision, which states that "[t]he expenses of
12 arbitration, including reasonable attorney's fees, will be paid for by the party against whom
13 the final award of the arbitrator(s) is rendered, except as otherwise required by Law."
14 (Doc. 43-6 at 91; Doc. 69-3 at 96.) In *Lim*, the Ninth Circuit held that a fee-shifting
15 provision is unconscionable as applied to a delegation clause when it creates the possibility
16 that a party might have to bear costs beyond what the party would bear in federal court.

> This creates a chilling effect on Lim enforcing his rights because it exposes him to the possibility of paying attorney's fees to TForce if he lost at arbitration, including fees associated with the threshold issue of arbitrability. Importantly, Lim would not face that risk in federal court because California public policy unequivocally prohibits an employer from recovering attorney fees for defending a wage and hour claim.

*Lim*, 8 F.4th at 1003 (internal quotation marks and citation omitted). The instant case, which concerns a federal antitrust claim, is substantively similar to the case in *Lim*, which concerned a California employment claim. Plaintiffs point out that the federal antitrust statutes provide for an award of fees and costs to a prevailing plaintiff, but not to a prevailing defendant (absent bad faith). (Doc. 68 at 11 (citing 15 U.S.C. § 4304(a)).) Thus, Plaintiffs' argument that the arbitration agreement's fee-shifting provision unconscionably chills the enforcement of their rights is consistent with Ninth Circuit precedent.

1   Defendants' only counterargument is that the fee-shifting provision only applies "except
2   as otherwise required by Law." (Doc. 72 at 7.) Defendants cite to *Cabanillas, v. 4716 Inc.*,
3   No. CV-20-00894-PHX-MTL, 2021 WL 3773765, at *4 (D. Ariz. Aug. 25, 2021), in which
4   this court held that the fee-shifting provision was not unconscionable because it was simply
5   ineffective in light of the non-abridgeable nature of the FLSA's own fee-shifting
6   provisions. This citation is unavailing for two reasons. First, Defendants do not direct the
7   Court's attention to any statute or case stating that the antitrust laws' internal fee-shifting
8   provisions are categorically non-abridgeable, so it is not clear what effect, if any, the
9   arbitration agreement's "except" language would have. Second, in a case post-dating
10  *Cabanillas*, the Ninth Circuit held that, far from alleviating unconscionability, a fee-
11  shifting agreement's "except" language actually exacerbates unconscionability where the
12  impact of such language is ambiguous or opaque. *Ronderos v. USF Reddaway*, Inc., 114
13  F.4th 1080, 1091–92 (9th Cir. 2024). Such is the case here. Defendants have not rebutted
14  Plaintiffs' argument that the arbitration agreement's fee-shifting provision creates a
15  "chilling effect" under *Lim*, including as applied to the delegation clause. *See* 8 F.4th
16  at 1003. Therefore, here as in *Lim*, the delegation clause is unconscionable.

17  Finally, Plaintiffs contend that the delegation clause is unconscionable because,
18  under the arbitration agreement's confidentiality provision, "plaintiffs cannot learn how
19  arbitrators have ruled with respect to any of the abusive provisions in Caremark's clause,
20  but Caremark has this information." (Doc. 70 at 13.) The Ninth Circuit has repeatedly held
21  that confidentiality provisions render arbitration agreements unconscionable.

> We conclude, however, that if the company succeeds in imposing a gag
> order, plaintiffs are unable to mitigate the advantages inherent in being a
> repeat player . . . . Thus, AT&T has placed itself in a far superior legal posture
> by ensuring that none of its potential opponents have access to precedent
> while, at the same time, AT&T accumulates a wealth of knowledge on how
> to negotiate the terms of its own unilaterally crafted contract.

*Ting v. AT&T*, 319 F.3d 1126, 1152 (9th Cir. 2003); *accord Davis v. O'Melveny & Myers*,
485 F.3d 1066, 1078 (9th Cir. 2007); *Pokorny v. Quixtar, Inc.*, 601 F.3d 987, 1002 (9th

Cir. 2010). Defendants' primary counterargument is a citation to a case rejecting the *Ting* line of cases on the ground that California law has since departed from the federal rule noted in *Ting* and its progeny. (Doc. 72 at 8 (citing *Poublon v. C.H. Robinson Co.*, 846 F.3d 1251, 1266–67 (9th Cir. 2017)).) But the divergence between California law and *Ting* is of no consequence to this case, which is governed by Arizona law. Defendants cite to a case from this District holding that the unconscionability of confidentiality agreements is a fact-intensive question that depends on the terms of the agreement. (Doc. 72 at 8 (citing *Morris v. Pac. Dental Servs. LLC*, No. CV-22-00370-TUC-JGZ, 2023 WL 4826142, at *5 (D. Ariz. July 27, 2023)).) But here, as elsewhere in their briefing, Defendants fail to make any argument that addresses the facts and circumstances of the particular confidentiality provision contained in the parties' contract. Citations to cases supporting generalized legal propositions are not a substitute for particularized argumentation, especially in a case such as this that is intrinsically fact-specific. "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). Although many of Defendants' propositions contain the germ from which an effective argument could sprout, Defendants by and large fail to develop their contentions beyond contextless case citations. The Court is unwilling to take up Defendants' cause as its own and advocate on their behalf. Plaintiffs have demonstrated that the delegation clause is substantively unconscionable.

### 2. Procedural Unconscionability of the Delegation Clause

Plaintiffs argue that the delegation clause is procedurally unconscionable because it is a contract of adhesion subject to unilateral amendment. As noted above, the Court is unpersuaded by Plaintiffs' contentions regarding Caremark's unilateral amendatory power because Plaintiffs fail to point to relevant instances where the *exercise* of that power would render the delegation clause unconscionable as applied to Plaintiffs. Plaintiffs concede that adhesion contracts are not *per se* unconscionable but cite to an Arizona case for the proposition that "a contract of adhesion may raise heightened concerns." (Doc. 44 at 14–15 (quoting *Duenas v. Life Care Centers of Am., Inc.*, 236 Ariz. 130, 137 n.2 (Ct. App. 2014)).) However, the full quote from *Duenas* is that adhesion contracts "may raise heightened

concerns *under the doctrine of reasonable expectations*." (Emphasis added.) Here, Plaintiffs do not contend that their reasonable expectations were frustrated. Instead, they argue that they had no choice but to enter into a contract that was transparently unconscionable from the outset. (*See* Doc. 44 at 15.) That is merely a roundabout way of asserting substantive unconscionability. In the same vein, Plaintiffs quote *Maxwell v. Fid. Fin. Servs., Inc.*, 184 Ariz. 82, 89 (1995), for the proposition that "substantive unconscionability sometimes helps confirm or provide evidence of procedural unconscionability." Because the Court has already determined that the delegation is void for substantive unconscionability, the Court need not determine whether that substantive unconscionability also gives rise to procedural unconscionability. The Court therefore declines to consider further Plaintiffs' allegations of procedural unconscionability.

## IV. Conclusion

The delegation clause is unenforceable. Therefore, the Court, not an arbitrator, is the arbiter of whether Plaintiffs' claims are arbitrable. Plaintiffs urge the Court to find the arbitration agreement as a whole unconscionable for the same reasons that the delegation clause is unconscionable. The Court could likely do so, as Plaintiffs have established a *prima facie* showing of unconscionability that Defendants have failed to meaningfully rebut. However, the court finds such a disposition inappropriate. In contrast to the arbitration of a questionable delegation clause, for which there is no generally favorable federal policy, *see First Options*, 514 U.S. at 944–45, the FAA does favor the arbitration of Plaintiffs' substantive claims, *see Moses*, 460 U.S. at 24. The Court is less willing to overlook Plaintiffs' evidentiary shortcomings regarding the apparently unconscionable escrow provision where there is a federal policy on the scales, even in light of Defendants' failure to mount a particularized counterargument. And if the escrow provision is not unconscionable as applied to Plaintiffs, it is unclear whether the confidentiality and fee-shifting provisions standing on their own would render the arbitration agreement unconscionable on the whole. Furthermore, neither party addresses the fact-specific consequences of the provisions that affect the validity of the arbitration agreement but not

the delegation clause, such as the relevant discovery constraints and truncated limitations period.

Therefore, the Court concludes that the appropriate course of action is to order supplemental briefing on the question of whether the arbitration agreement is unconscionable. Supplemental briefing is consistent with the summary judgement standard applicable to the instant motions, as that standard requires deliberation upon evidence. The parties shall confine their analysis to substantive unconscionability. Crucially, the parties must not merely adduce caselaw, but must apply that caselaw to the facts and claims of this case. The parties shall also address the issue of severability, again ensuring that they give due consideration to the specific circumstances of this case. The supplemental briefing shall not exceed twenty pages in length, exclusive of supporting evidence. The parties shall have until January 1, 2025 to file their supplemental briefs. The parties may move for an extension of this deadline. The Court will assess the need for oral argument, as requested by the parties, upon receipt of supplemental briefing.

**IT IS THEREFORE ORDERED** denying in part Defendants' Motions to Compel Arbitration. (Doc. 42; Doc. 68.)

**IT IS FURTHER ORDERED** deferring a final disposition of the remainder of Defendants' Motions.

**IT IS FURTHER ORDERED** directing the parties to file supplemental briefing by **January 1, 2025** as described herein.

Dated this 13th day of November, 2024.

Honorable John J. Tuchi
United States District Judge